**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND,<br>525 East Cotati Avenue<br>Cotati, CA 94931, and Sally Baldwin<br><br>Plaintiff,<br><br>v.<br><br>THOMAS VILSACK, in His Official Capacity As Secretary, United States Department of Agriculture,<br>1400 Independence Avenue SW<br>Washington, DC 20250,<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE,<br>1400 Independence Avenue SW<br>Washington, DC 20250,<br><br>DR. MICHAEL WATSON, in His Official Capacity As APHIS Administrator,<br>4700 River Road<br>Riverdale, MD 20737,<br><br>ANIMAL AND PLANT HEALTH INSPECTION SERVICE,<br>4700 River Road<br>Riverdale, MD 20737,<br><br>Defendants. | Case No. 24-cv-2074<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. For 25 years, Yellowstone Bear World ("Bear World"), a drive-through wildlife park and petting zoo in rural Idaho, has violated the Animal Welfare Act ("AWA"), 7 U.S.C. § 2131 *et seq*., and state law by charging people to bottle feed and take pictures with months-old baby bears prematurely torn away from their mothers. Bear World has prioritized making money off of exhibiting black bears through countless deplorable tactics—such as breeding bears to be

used for photo shoots where any person over five years old can touch and bottle feed the months-old babies, who are kept in a barren pen for the viewing public. This scheme also includes hauling the bear cubs across state lines and allowing an unlimited number of people to observe, handle, and harass the cubs for hours on end at traveling exhibits. Forcing vulnerable cubs into these stressful interactions with humans causes the bears severe behavioral distress and harm. And tearing apart cubs from their mothers threatens the cubs' development and traumatizes both them and their mothers.

2. These inhumane and cruel practices violate the Animal Welfare Act, whose purpose is to "insure that animals intended … for exhibition … are provided humane care and treatment." 7 U.S.C. § 2131. In enacting the Act, Congress recognized that "it is essential to regulate" the "handlin[g] and treatment of animals" used "for exhibition." *Id.* U.S. Department of Agriculture ("USDA") regulations promulgated under the Animal Welfare Act thus require exhibitors to handle every animal as "expeditiously and carefully as possible in a manner that does not cause trauma, … behavioral stress, physical harm, or unnecessary discomfort." 9 C.F.R. § 2.131(b)(1). They further mandate that "[a]nimals shall be exhibited only for periods of time and under conditions consistent with their good health and well-being." *Id.* § 2.131(d)(1). And the regulations also prohibit exhibitors like Bear World from allowing the public to have contact with dangerous animals, including bears, that are over 12 weeks old. *Id.* § 2.131(d)(3).

3. Many of these reprehensible practices also violate or have violated state wildlife and federal safety laws. Bear World's public bottle feeding has long violated Idaho statutes that, until April 2023, outlawed public feeding of wildlife. Idaho IDAPA Code 13.01.10, 411 Humane Treatment of Captive Wildlife 01(b)(i). Yet Bear World openly defied that law for decades, leading the Idaho Department of Fish and Game to cite the facility in 2022. Then, on February 7,

2023—just three days before the USDA approved its Animal Welfare Act license—Bear World was cited again, this time by the federal Occupational Safety and Health Administration ("OSHA"), for "serious" violations pertaining to its handling of bears.

4. Bear World's ongoing, well-advertised, and notorious practices should have precluded the USDA from ever issuing Bear World an Animal Welfare Act license. The Animal Welfare Act requires that before an exhibitor obtains a license (which is a prerequisite to exhibition, 7 U.S.C. § 2134), they must "demonstrate[] that his facilities comply with the standards promulgated by" the USDA. 7 U.S.C. § 2133. Yet Bear World has been able to get away with these tactics for more than two decades in part because, until recently, the USDA renewed exhibitor licenses annually as a matter of course without conducting any inspections. *See, e.g.*, *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 617–18 (D.C. Cir. 2017) (describing how the USDA "rel[ied] on a license renewal applicant's self-certification to demonstrate compliance").

5. Prompted by litigation, the USDA recently abandoned this renewal scheme. As of November 9, 2020, the USDA now issues exhibitor licenses for three-year terms, and will not issue a license until a pre-license inspection shows the facility affirmatively "demonstrate[s] compliance" with the Act. USDA, Animal Welfare; Amendments to Licensing Provisions and to Requirements for Dogs, 85 Fed. Reg. 28772-01; *see also* 9 C.F.R. §§ 2.3(b), 2.5. The USDA itself emphasized that "prelicense compliance inspections" were necessary because the agency's prior self-certification policy had led to "concern[s] that licensees may [be] struggl[ing] to achieve and maintain [Animal Welfare Act] compliance." 85 Fed. Reg. at 28780.

6. Despite this new licensing regime, the USDA's inspections are still woefully inadequate. The USDA's approval of Bear World's most recent license (the facility's first under

the new regime) is an infamous illustration. On February 10, 2023, the USDA issued an exhibitor's license to Bear World with full knowledge that bottle feeding, maternal deprivation, and inhumane handling are practices that regularly occur and have regularly occurred for decades. The USDA knows about these unlawful practices because it has received repeated complaints about them. Bear World's public website also heavily promotes its cub bottle feeding and public contact experiences and openly describes how it prematurely separates cubs from their mothers when they are less than two months old while admitting that, in the wild, bear cubs remain with their mother for up to two years. Even a cursory review of the facility's website also reveals that Bear World's bottle feeding uses bears often far older than the 12 weeks allowed by the USDA's own regulations.

7. Even with this knowledge, the USDA conducted its pre-licensing inspection when it could not have actually observed these egregious practices—on February 9, 2023, while the facility was closed to the public. Bear World is open to the public from May to October each year. As a result, the USDA was unable to inspect the public bottle feeding, maternal deprivation, and handling practices that are flagrant violations of the Animal Welfare Act and thus should have prevented approval of Bear World's license.

8. The USDA also failed to confirm that the facility complied with other federal and state laws implicating the welfare of animals, as required by the Act. The USDA granted the license despite OSHA's citation to Bear World for "serious" violations just three days earlier and the Idaho Department of Fish and Game's 2022 citation to the facility for public feeding of bears—even though the Act prohibits the USDA from issuing a license "to any applicant who . . . has been found to have violated any Federal, State, or local laws or regulations pertaining to the transportation, ownership, neglect, or welfare of animals." 9 C.F.R. § 2.11(a)(7). The USDA also

ignored Bear World's ongoing violation of Idaho's ban on public feeding of wildlife even though the Act bars a license for any applicant who "[w]ould be operating in violation or circumvention of any … State … laws." *Id.* § 2.11(a)(6). What's more, Bear World falsely certified in its license application that it had no "violation of … state … laws or regulation pertaining to … the transportation, ownership, neglect, or welfare of animals," despite its obligation to disclose such information. *Id.* § 2.1(a)(1)(vii). This false certification should have independently precluded the USDA from issuing a license because its regulations prohibit issuance of "[a] license . . . to any applicant who . . . [h]as made any false or fraudulent statements … to the Department." *Id.* § 2.11(a)(7).

9. Despite these obvious and known violations—and with no reason to suspect that Bear World's exploitative practices had changed—the USDA approved Bear World's animal exhibitor license. The inspection report documenting Bear World's pre-licensing inspection states nothing other than that the USDA found "no noncompliant items," and that "[t]he applicant is ready to be licensed under the [Animal Welfare Act]."

10. For all of these reasons, the USDA's approval of Bear World's license violated the Animal Welfare Act and was arbitrary and capricious, not in accordance with law, exceeded its statutory jurisdiction and authority, and failed to follow procedure required by law, in violation of the APA, 5 U.S.C. § 706(2). Bear World's license should be vacated.

**JURISDICTION, VENUE, AND RELIEF**

11. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 because this action constitutes a federal question under the Administrative

Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and the Animal Welfare Act, 7 U.S.C. § 2131 *et seq*.

12. Venue is proper in this Court under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e). Defendants USDA and APHIS (a USDA agency) are headquartered in the District of Columbia.

13. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. Injunctive relief is authorized by Federal Rule of Civil Procedure 65 and the APA, 5 U.S.C. § 706.

## PARTIES

### I. Plaintiff

14. Plaintiff ANIMAL LEGAL DEFENSE FUND ("ALDF") is a national animal advocacy non-profit organization headquartered in Cotati, California, with over 300,000 members.

15. ALDF pursues its mission of "protecting the lives and advancing the interests of animals" by advocating against cruelty to animals and advocating for the protection of animals used in commercial enterprises. ALDF frequently advocates for increased protections of animals used for entertainment and exhibition purposes. ALDF has expended significant organizational resources on advocacy and public education efforts to improve the welfare of animals—including captive wildlife—that are held in captivity.

16. ALDF brings this action on behalf of its members, who have an aesthetic and emotional connection to the bears at Bear World. Several ALDF members have visited Bear World, where they observed, had interactions with, and developed aesthetic and emotional connections to the animals there, including the black bears. These members became distressed

and upset due to the animal mistreatment and suffering that they witnessed. The inhumane and inadequate conditions prevent ALDF members from viewing and enjoying the animals kept there.

17. ALDF's members' interests are harmed by the USDA's unlawful decision to approve Bear World's license, which allows Bear World to continue causing harm to the bears at its facilities, which, in turn, adversely affects ALDF's members' relationship with them.

18. Sally Baldwin ("Ms. Baldwin") is a member of ALDF who lives in Idaho Falls, Idaho. Ms. Baldwin derives personal, recreational, educational, and aesthetic value from being in the presence of animals, including bears, and observing them in humane conditions.

19. Because of her interest in observing animals, starting in 1998 (when Bear World opened), Ms. Baldwin visited Bear World on an annual basis. Ms. Baldwin was most interested in seeing the bears during her yearly visits, and formed an emotional attachment to the bears she observed.

20. Ms. Baldwin's annual visits continued until around 2012. Ms. Baldwin stopped her annual visits upon learning about how Bear World's bottle feeding and maternal deprivation practices exploit and harm the bears for profit. This was not information Ms. Baldwin was aware of in the many years she had been visiting. Once Ms. Baldwin became aware that these practices harm the bears, she stopped visiting the facility for recreational purposes.

21. Ms. Baldwin nonetheless returned to Bear World in March 2022 with her son, who went to document the observable effects on the bears resulting from Bear World's harmful treatment, including videoing the public bottle feeding activity. This was an emotionally disturbing experience for Ms. Baldwin. She observed bears (both cubs and yearlings, the aged out cubs) that were exhibiting abnormal pacing behaviors and bears that were severely overweight. Ms. Baldwin also observed cubs being bottle fed, passed around, and handled by members of the

public for long periods of time—and that the cubs were crying incessantly. She witnessed cubs so hungry they would do anything to get the bottle in their mouth, and would suckle the skin of any human in their panicked search for food. As Ms. Baldwin saw it, the bears had terror in their eyes. Ms. Baldwin suffered significant personal distress when she observed the cubs and yearlings suffering in these inhumane conditions, given that it was causing the bears both physical and psychological harm. Ms. Baldwin was haunted by the need to help the bears.

22. Ms. Baldwin began spending time trying to improve the circumstances of the bears. Shortly after her most recent visit, she attended a protest in April 2022 against Bear World. She drove three hours to Wellsville, Utah to protest Bear World's traveling exhibit at the Heritage Center in town. Along with other protesters, Ms. Baldwin stood on the side of the road directly before the entrance to the facility. Ms. Baldwin held signs up to visitors entering the facility to protest Bear World's handling and treatment of the bears.

23. Ms. Baldwin has also avoided frequenting other locations where Bear World exhibits the bears in traveling shows, including Cabela's (a sporting goods store) and C-A-L Ranch (a camping, hunting, and farming store), both near her home in Idaho Falls. She has told these businesses that she is refusing her business because of the emotional distress she feels by seeing the harm Bear World has caused the bears. Ms. Baldwin has also posted on their Facebook pages asking the stores to not host Bear World's exhibits because it harms the bears.

24. Because ALDF's members, including Ms. Baldwin, appreciate and are attached to the particular animals at Bear World and are concerned about their welfare, they wish to observe the animals in humane conditions and, likewise, are injured by seeing them in inhumane, harmful conditions.

25. The aesthetic, emotional, and educational interests of ALDF's members—including Ms. Baldwin—will be redressed if ALDF prevails because a vacatur of the agency's license approval will force Bear World to either: (1) end its unlawful practices in order to obtain approval of its exhibitor license; or (2) stop exhibiting bear cubs to the public altogether. If Bear World ends its harmful practices, ALDF members with aesthetic interests in observing the bears (including Ms. Baldwin) will visit them and enjoy observing the animals living under much more humane conditions. And if Bear World stops exhibiting bear cubs to the public, ALDF members like Ms. Baldwin would be redressed by knowing that the bears are no longer being subject to inhumane practices.

26. ALDF and its members seek to guard their interests in protecting the lives of and advancing the interests of the exhibited wildlife located at Bear World. Further, both ALDF and its members have been, and will continue to be, harmed by Defendants' unlawful licensure of Bear World under the Animal Welfare Act. Neither the claims asserted by ALDF, nor the relief it requests, require the participation of its individual members.

**II. Defendants**

27. The UNITED STATES DEPARTMENT OF AGRICULTURE ("USDA") is the agency responsible for administering the Animal Welfare Act and therefore ensuring the humane care and treatment of animals that are used for exhibition. The USDA is the federal agency that approved Bear World's license in February 2023 despite the facility's Animal Welfare Act violations.

28. THOMAS VILSACK is the Secretary of Agriculture and is responsible for administering the Animal Welfare Act. Secretary Vilsack is ultimately responsible for the

agency's decision to approve Bear World's Animal Welfare Act license. He is sued in his official capacity.

29. The ANIMAL AND PLANT HEALTH INSPECTION SERVICE ("APHIS") is the USDA subagency responsible for administering the Animal Welfare Act.

30. DR. MICHAEL WATSON is the Administrator of APHIS and is responsible for administering the Animal Welfare Act. He is sued in his official capacity.

## LEGAL FRAMEWORK

31. The primary purpose of the Animal Welfare Act is to "insure that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment." 7 U.S.C. § 2131(1).

32. To accomplish this purpose, Congress directed the Secretary of Agriculture to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors." 7 U.S.C. § 2143(a)(1). The standards must include "minimum requirements for handling, housing, feeding, watering, sanitation, ventilation, shelter from extremes of weather and temperatures, [and] adequate veterinary care." *Id.*§ 2143(a)(2)(A). APHIS is the USDA entity charged with enforcing the Animal Welfare Act.

33. Under the Animal Welfare Act, no one may exhibit animals "unless and until such dealer or exhibitor shall have obtained a license." 7 U.S.C. § 2134. To obtain a license, an exhibitor must file an application, 9 C.F.R. § 2.1, which includes disclosing any violations of federal or state law pertaining to the welfare of animals, *id.* § 2.1(a)(1)(vii). Exhibitors must also acknowledge their understanding of the Animal Welfare Act regulations and standards and agree to comply with the standards, *id.* § 2.2, and "be inspected by APHIS and demonstrate compliance

with the Act and the regulations and standards … before APHIS will issue a license," *id*. § 2.3(b). A facility must obtain a new license every three years. *Id*. § 2.5(a).

34. "[N]o such license shall be issued until the dealer or exhibitor shall have demonstrated that his facilities comply" with the Animal Welfare Act standards. 7 U.S.C. § 2133. "Each applicant for a license must demonstrate that his or her location(s) and any animals, facilities, vehicles, equipment, or other locations used or intended for use in the business comply with the Act and the regulations and standards." 9 C.F.R. § 2.3(a). This includes requirements for handling during public exhibition. *See id*. § 2.131(c)–(d) (discussed below).

35. "The failure of any person to comply with any provision of the Act, or any of the provisions of the regulations or standards" promulgated pursuant to the Act "shall constitute grounds for denial of a license" application. 9 C.F.R. § 2.1(d). In addition, "[a] license will not be issued to any applicant who . . . [h]as made any false or fraudulent statements … to the Department" or "has been found to have violated any Federal, State, or local laws or regulations pertaining to the transportation, ownership, neglect, or welfare of animals." *Id*. § 2.11(a)(7). A license will also "not be issued to any applicant who … [w]ould be operating in violation or circumvention of any … State … laws." *Id*. § 2.11(a)(6).

## I. Relevant Animal Welfare Act Standards

36. The following is a non-exhaustive list of Animal Welfare Act standards governing exhibitors like Bear World.

### A. Handling of Animals

37. Exhibitors must handle every animal as "expeditiously and carefully as possible in a manner that does not cause trauma, overheating, excessive cooling, behavioral stress, physical harm, or unnecessary discomfort." 9 C.F.R. § 2.131(b)(1).

38. "Animals shall be exhibited only for periods of time and under conditions consistent with their good health and well-being." 9 C.F.R. § 2.131(d)(1).

39. "Young or immature animals shall not be exposed to rough or excessive public handling or exhibited for periods of time which would be detrimental to their health or well-being." 9 C.F.R. § 2.131(c)(3).

40. "[D]uring public exhibition, any animal must be handled so there is minimal risk of harm to the animal and to the public, with sufficient distance and/or barriers between the animal and the general viewing public so as to assure the safety of animals and the public." 9 C.F.R. § 2.131(c)(1).

**B. Public Contact with Dangerous Animals Over 12 Weeks Old**

41. Animal Welfare Act regulations and guidance prohibit exhibitors from allowing the public to have contact with dangerous animals over 12 weeks old. 9 C.F.R. § 2.131(d)(3); *see also* USDA Animal Welfare Inspection Guide, March 2024 ("USDA Guide"), Sections 4.17.1.2; 4.18.2.

42. Bears are considered dangerous animals. 9 C.F.R. § 2.131(d)(3); *see also* USDA Guide, Sections 4.17.1.2; 4.18.2.

**C. Public Feeding of Animals**

43. The Animal Welfare Act permits public feeding of animals only "[i]f public feeding of animals is allowed." 9 C.F.R. § 2.131(d)(4).

44. Until April 2023, Idaho law stated that "[t]he public is not allowed to feed any captive wildlife." Idaho IDAPA Code 13.01.10, 411 Humane Treatment of Captive Wildlife 01(b)(i). Bear cubs fell within the definition of "captive wildlife." *See* Idaho IDAPA Code 13.01.06.100.

45. Effective April 6, 2023, Idaho's law was amended—as a result of lobbying by Bear World—to remove the explicit prohibition on public feeding and now requires that "[p]ublic handling or feeding of warm-blood animals possessed under a valid USDA Exhibitor license is regulated by USDA under 9 CFR." IDAPA 13.01.10.400.

**D. Licensing Inspections of Animal Exhibitors**

46. Licensing inspections are governed by the Animal Welfare Act, its implementing regulations, and the USDA's publicly available Animal Care Inspection Guide, which is an aid for USDA animal care personnel in conducting licensing inspections. It "summarizes current regulatory and procedural criteria for USDA licensed/registered facilities and provides examples of inspection processes for verifying compliance" with the Animal Welfare Act. USDA Guide, Section 1.1.

47. Under the Animal Welfare Act, "[t]he Secretary shall make such investigations or inspections as he deems necessary to determine whether any … exhibitor … has violated or is violating any provision of this chapter or any regulation or standard issued thereunder." 7 U.S.C. § 2146(a).

48. An exhibitor must "be inspected by APHIS and demonstrate compliance with the Act and the regulations and standards … before APHIS will issue a license." 9 C.F.R. § 2.3(b).

49. Animal Welfare Act regulations and guidance require the USDA to inspect facilities during business hours to ensure the facilities are complying with the Animal Welfare Act. 9 C.F.R. § 2.126(a); *see also* USDA Guide, Sections 2.3; 3.1; 3.2; 4.12.5.

50. In preparing for the inspection, the inspector must review the applicable regulations and standards, as well as any pending investigations and prior enforcement actions against the facility, among other things. *See* USDA Guide, Section 3.1.

51. During the inspection, inspectors must "[i]nspect the entire facility thoroughly," and "[b]e certain to verify the locations of all animals on site and off site that are used or intended for regulated use." USDA Guide, Section 4.19.2.1.

52. Inspectors must "[o]bserve the animals for their health and well-being." USDA Guide, Section 3.2.4.1. "If public feeding is allowed," inspectors must "observe how it is accomplished." USDA Guide, Section 4.12.1.1.

53. During inspections, inspectors must also "[o]bserve handling techniques of personnel," "evaluate the handling experience and qualifications of the personnel," as well as "[r]eview supervisor and employee experience and training and ensure the facility has a sufficient number of employees." USDA Guide, Section 3.2.4.1; *see also id*. Section 4.12.5.9.

54. Inspectors must also confirm that exhibitors demonstrate compliance with the Animal Welfare Act regarding any other locations that a facility intends to conduct business, such as a traveling exhibit. *See* 9 C.F.R. § 2.3(a). This includes observing "[a]ny direct contact activity allowed with the public, such as feeding or photos," as well as the "[q]ualifications and training of the animal handlers" at the traveling exhibit. USDA Guide, Section 4.22.4.1.

**E. Consultation and Cooperation with Other Federal Entities and States**

55. Under the Animal Welfare Act, "[t]he Secretary [of the USDA] shall consult and cooperate with other Federal departments, agencies, or instrumentalities concerned with the welfare of animals used for … exhibition … in carrying out the purposes of this chapter." 7 U.S.C. § 2145(a).

56. The Secretary is also "authorized to cooperate with the officials of the various States or political subdivisions thereof in carrying out the purposes of this chapter and of any State, local, or municipal legislation or ordinance on the same subject." 7 U.S.C. § 2145(b); *see also* 85

Fed. Reg. at 28774 ("The AWA authorizes and encourages APHIS to cooperate with State and other officials in carrying out the purposes of the AWA and any State, local, or municipal legislation or ordinance on the same subject.").

57. As the USDA explained in its recent rulemaking, "the regulations in [9 C.F.R.] §§ 2.11 and 2.12 have long stipulated that any license applicant or holder who is violating or circumventing State law may be subject to the denial or termination of a license." 85 Fed. Reg. at 28774.

**II. The Administrative Procedure Act**

58. The APA requires courts to "set aside agency action" that is: "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations," *id*. § 706(2)(C); and "without observance of procedure required by law," *id*. § 706(2)(D).

59. "Agency action" includes "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(12); *see also id*. § 701(2).

60. Agency action is "arbitrary and capricious" "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

61. Agency action is "in excess of statutory jurisdiction, authority, or limitations" if the agency "exceed[s] its statutory bounds." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018).

62. Agency action is "without observance of procedure required by law" if the agency acts contrary to the procedures in its regulations. *See Blanton v. Off. of the Comptroller of the*

*Currency*, 909 F.3d 1162, 1171 (D.C. Cir. 2018); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 417 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

## FACTS

63. Bear World is a drive-through wildlife park and petting zoo in rural Idaho that is located on the most popular route to Yellowstone National Park and is open to the public from May through October each year. Since its opening in 1998, Bear World has confined and exhibited many species of wildlife and other animals, including but not limited to black bears, Grizzly bears, elk, bison, white-tail deer, mule deer, and moose. As of February 2023 (the time of the USDA's licensing inspection), Bear World held at least 118 animals on site, including at least 76 black bears.

### I. Bear World Exploits Bear Cubs For Profit

64. A prominent source of income for Bear World is its practice of allowing public bottle feeding of black bear cubs, which, as its website heavily advertises, is an experience it offers three times per day to anyone older than five years of age for $75 per person. *See, e.g.*, Yellowstone Bear World, "Bottle Feeding," https://yellowstonebearworld.com/experiences/bottle-feeding. Promoted as a "once in a lifetime experience," the bottle feeding experience allows the public to actually bottle feed and pet the baby bear cubs, and participants "will also receive a photo to remember the experience and your time spent with the cubs." *Id*.

65. Bear World also offers "VIP Cub Encounters"—a "unique, private experience for you and up to 15 of your closest pals" to "get face to face with bear cubs"—where participants "spend[] an entire hour with these adorable cubs, creating memories that will last a lifetime."

Yellowstone Bear World, "VIP Cub Encounter," https://yellowstonebearworld.com/vip-cub-encounter.

66. Bear World offers these cub interactions at its facility as well as during traveling exhibits called "Baby Animals Days," where Bear World hauls the months-old cubs to new and stressful environments. This includes other local places in Idaho as well as exhibitions in Wellsville, Utah—a three hour drive away.

67. The detrimental effects resulting from Bear World's practices have been well-documented. At the facility, cubs have been seen exhibiting aggression and distress while awaiting public feeding and engaging in stereotypic behavior, such as abnormal suckling and pacing. Bear World's yearling cubs—cubs used for the prior year's public bottle feeding—also engage in stereotypic behaviors. Additionally, at Bear World's traveling exhibits, cubs have exhibited clear signs of distress, including stereotypic suckling, crying, struggling to escape handlers and the public, and hanging limp from apparent exhaustion after being subject to hours of handling.

68. Public contact and feeding of young cubs are incredibly harmful to the cubs' health. It inherently deprives the cubs of necessary sustenance, as Bear World withholds food from the bear cubs to further its public feeding experience. Cubs and adult bears thus learn to beg for food, which causes unnecessary behavioral stress. Many cubs also become obese while forced to bottle feed, which is likewise detrimental to their health and well-being. *Cf. People for Ethical Treatment of Animals, Inc. v. Wildlife in Need and Wildlife in Deed, Inc.*, 476 F. Supp. 3d 765 (S.D. Ind. 2020) (explaining similar harmful effects on baby tigers of similar public contact and feeding).

69. To make matters worse, Bear World separates bear cubs from their mothers to maximize revenue from its public bottle feeding experience. In the wild, bear cubs remain with their mother for "up to two years." Yellowstone Bear World, "FAQs: Is Yellowstone Bear World

ethical?", https://yellowstonebearworld.com/about-ybw/faqs. According to Bear World's website, it separates cubs from their mothers at less than "eight weeks." *Id*. This early separation, referred to as "maternal deprivation," threatens the development of every bear cub the facility breeds for its profit-seeking bottle feeding and photo opportunities. Bear World markets this practice as necessary to acclimate the cubs to human feeding and "establish a bond with the cubs," *id.*, yet it causes additional unwarranted behavioral stress on the bears.

70. These practices not only harm the bears, but also pose great risk to the public (and staff) who interact with them each day. At Bear World, public bottle feeding continues into a late enough age that each cub becomes large enough to pose a public safety risk to the many children and adults who feed them, pet them, and take photos with them each day. As the facility's website explains, bear cubs are usually born "between mid-January and early February," Yellowstone Bear World, "When Do Cubs Become Independent?," https://yellowstonebearworld.com/when-do-cubs-become-independent, yet Bear World is open to the public from May through October, *id*. "Hours of Operation," https://yellowstonebearworld.com/ ("Starting May 11"). When the facility opens in May, the public interacts with three month old cubs. By October, those cubs are over eight months old. Each year, Bear World breeds more cubs to ensure it has stock available for the next lucrative bottle feeding season. *See* Yellowstone Bear World, "Bear World History," https://yellowstonebearworld.com/about-ybw/bear-world-history (advertising that the facility's wildlife are all "captive bred, born and raised").

## II. USDA Approves Bear World's License Despite Knowledge of its Unlawful Practices

71. The USDA has known for years that Bear World engages in these practices.

72. For example, on April 22, 2022, the USDA received a complaint raising issues with Bear World's public handling of bears both at the facility and during its traveling exhibits. This

included concerns about multiple bear cubs exhibiting signs of stress and exhaustion likely due to excessive handling, noise, inadequate space and enrichment, and/or overheating, as well as abnormal suckling behavior. The complaint explained that the suckling behavior could be due to stress and fear, and was likely exacerbated by premature separation from the cub's mother.

73. The USDA received another complaint on July 25, 2022, which raised concerns about Bear World's practice of allowing the public to bottle feed bear cubs over 12 weeks of age, even though the USDA explicitly prohibits public contact with dangerous animals (including bears) of that age or older. 9 C.F.R. § 2.131(d)(3); *see also* USDA Guide, Sections 4.17.1.2; 4.18.2. Attached to the letter was a screenshot of Bear World's website page advertising its "Once in a Lifetime" "Bottle Feeding Bear Cubs" "Experience."

74. The USDA received similar complaints raising issues with these practices in 2020 and 2021. At least one of those complaints also flagged for USDA that Bear World's public bottle feeding practices violate Idaho state law, which at the time stated without any exceptions that "[t]he public is not allowed to feed any captive wildlife," which included bears. IDAPA Code 13.01.10. The USDA's complaint report also definitively shows that the USDA was aware of Bear World's bottle feeding practice. It notes that, during the inspection triggered by the complaint, "[t]he cub bottle feeding activity was observed."

75. Notwithstanding the USDA's knowledge of these harmful practices—and with no reason to suspect that Bear World's unlawful practices had changed—the USDA approved Bear World's animal exhibitor license on February 10, 2023, which is effective for three years, 9 C.F.R. § 2.5(a). The USDA's public online database identifies Bear World as an exhibitor with an "active" Animal Welfare Act license, with license number 82-C-0042. This approval was based on two inspections (a "re-license" and a "pre-license" inspection) the USDA conducted on

February 9, 2023. The publicly available inspection reports provide limited information about the inspection process—they state only the type and number of animals inspected and that "no noncompliant items were identified."

### III. USDA's Approval of Bear World's License Violates the Animal Welfare Act and the APA

76. The USDA's February 10, 2023 approval of Bear World's license violates the Animal Welfare Act, the USDA's own regulations, and the APA, 5 U.S.C. § 706(2), for multiple reasons:

77. First, the USDA's approval is based on an inspection that was shockingly deficient. The USDA inspected Bear World when it was closed to the public—so its practices exhibiting, handling, and transporting animals could not be observed—and thus it was impossible for the USDA to ensure that the facility was complying with the Animal Welfare Act, contrary to the statute's requirements and the USDA's regulations promulgated under it. *See* 7 U.S.C. § 2146(a). Even if the USDA could lawfully inspect when Bear World was closed, moreover, there is no evidence that the inspector even considered the facility's known practices of bottle feeding cubs, allowing public contact with cubs over 12 weeks old, maternal deprivation, or its traveling cub exhibits—even though the Animal Welfare Act required it to review all of these practices. There is also no evidence that the USDA considered the federal violations that Bear World received three days before the USDA's license approval, or the state law violations it received seven months prior.

78. Second, even if the USDA had inspected when Bear World was open, Bear World could not have "demonstrated compliance" with the Animal Welfare Act (7 U.S.C. § 2133; 9 C.F.R. §§ 2.3(a)–(b)), for the reasons just explained: Bear World shamelessly allows the public to bottle feed cubs over 12 week old, and its practices of public bottle feeding, public contact,

traveling exhibits, and prematurely separating cubs from their mothers each cause bears significant duress and harm in violation of the Animal Welfare Act and multiple USDA regulations.

79. Third, the USDA's Animal Welfare Act regulations permit public feeding of animals only "[i]f public feeding of animals is allowed," 9 C.F.R. § 2.131(d)(4), and provide that "[a] license will not be issued to any applicant who … [w]ould be operating in violation or circumvention of any … State … laws," *id*. § 2.11(a)(6). Yet when the USDA approved Bear World's license in February 2023, Idaho law explicitly prohibited the public from feeding "captive wildlife," including bears. Idaho IDAPA Code 13.01.10.

80. Fourth, in approving Bear World's license, it is also clear that the USDA failed to consider the federal and state law violations Bear World had recently received, even though under 9 C.F.R. § 2.11(a)(7), "[a] license will not be issued to any applicant who . . . has been found to have violated any Federal, State, or local laws or regulations pertaining to the transportation, ownership, neglect, or welfare of animals." Just three days before the USDA approved Bear World's license, the OSHA had issued "serious" violations to Bear World and fined the facility $8,928 for putting its employees at risk of potential attacks from bears and exposing employees to hazardous chemicals in the form of bear spray without providing them with proper training or protocols. Seven months before that, on July 11, 2022, Bear World received a notice of violation from the Idaho Department of Fish and Game for multiple legal violations related to captive wildlife and large commercial wildlife facility operations. One of those violations was for allowing public feeding of wildlife in violation of Idaho law, Idaho IDAPA Code 13.01.10. The violation notice required Bear World to discontinue public feeding of wildlife at the facility by no later than October 16, 2022. This did not happen. There is no indication that the USDA considered any of this in approving Bear World's license or took any steps to consult with the relevant state

and federal agencies to identify the facility's past citations for unlawful conduct or its ongoing violations of Idaho law. *See* 9 C.F.R. § 2.11(a)(7).

81. Fifth, Bear World failed to disclose its state law violation to USDA on its license application, even though it was expressly required to do so under 9 C.F.R. § 2.1(a)(1)(vii). The application form asks the applicant to disclose "any" "finding of a violation of Federal, state, or local laws or regulations pertaining to animal cruelty or the transportation, ownership, neglect, or welfare of animals," *id*. § § 2.11(a)(7), to which Bear World responded "None." Because the Animal Welfare Act regulations state in no uncertain terms that "[a] license will not be issued to any applicant who … [h]as made any false or fraudulent statements or provided any false or fraudulent records to the Department," *id*., Bear World's false and incomplete certification should have precluded the issuance of a license as a matter of law.

82. At a minimum, Bear World's blatant misrepresentation also illustrates why the USDA should not be permitted to rely on self-reporting of violations. The Animal Welfare Act and the USDA's implementing regulations each expressly require that facilities must "demonstrate compliance" before they can be licensed under the Animal Welfare Act. 9 C.F.R. § 2.3(b); 7 U.S.C. § 2133. It is thus not enough for facilities to *certify* that they have not been cited for violations of state and federal law. The USDA must independently verify that this is true and that the facility therefore meets the requirements for licensing. Indeed, limiting reliance on self-reporting is precisely what the USDA's new licensing regime was designed to mitigate in requiring licensing inspections every three years. *See supra* ¶¶ 4–5. The USDA's acceptance of Bear World's misrepresentations is thus both unlawful and arbitrary and capricious.

83. For these reasons, the USDA's inspection and license approval process failed to comply with the procedures required by the Animal Welfare Act and the USDA's regulations or

the basics of reasoned decision-making as required by the APA. By approving Bear World's license, Defendants acted arbitrarily and capriciously, not in accordance with law, exceeded their statutory jurisdiction and authority, and failed to follow procedure required by law, in violation of the APA, 5 U.S.C. § 706(2).

## CLAIMS FOR RELIEF

84. Each and every allegation set forth above is incorporated herein by reference.

85. In approving Bear World's license despite the facility's failure to comply with the Animal Welfare Act and its implementing regulations, the USDA acted in a manner that is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, within the meaning of the APA. *See* 5 U.S.C. § 706(2)(A).

86. The decision to approve Bear World's license exceeds Defendants' statutory jurisdiction and authority, within the meaning of the APA. *See* 5 U.S.C. § 706(2)(C).

87. The decision to approve Bear World's license failed to follow procedure required by law, within the meaning of the APA. *See* 5 U.S.C. § 706(2)(D).

88. Defendants' unlawful actions injure Plaintiff in the manner specified in the allegations set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

89. Declare that Defendants acted arbitrarily and capriciously, exceeded their statutory jurisdiction and authority, and failed to follow procedure required by law, when they approved Bear World's license: Animal Welfare Act Certificate No. 82-C-0042 on February 10, 2023;

90. Set aside as unlawful the USDA's decision to approve Bear World's Class C Exhibitor License, Animal Welfare Act Certification No. 82-C-0042;

91. Order Defendants to refrain from approving Bear World's Class C Exhibitor License, Animal Welfare Act Certificate No. 82-C-0042, unless and until Bear World demonstrates compliance with the Animal Welfare Act and its implementing regulations;

92. Award Plaintiff its reasonable attorney fees and costs in this action, and;

93. Grant Plaintiff such other and further relief the Court may deem just and proper.

Dated: July 16, 2024

Respectfully submitted,

/s/ Matthew S. Rozen
Matthew S. Rozen (D.D.C. Bar No. 1023209)
Rebecca E. Smith (D.D.C. Bar No. 166610)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, DC 20036
(202) 887-3596
mrozen@gibsondunn.com
bsmith@gibsondunn.com

Daniel H. Waltz (D.D.C. Bar No. D00424)
Sarah Rogers (pro hac vice pending)
ANIMAL LEGAL DEFENSE FUND
525 East Cotati Avenue, Cotati, CA 94931
(707) 795-2533
dwaltz@aldf.org
srogers@aldf.org

*Attorneys for Plaintiff Animal Legal Defense Fund*