**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANIMAL LEGAL DEFENSE FUND** *and* **SALLY BALDWIN**, | |
| *Plaintiffs*, | |
| **v.** | Case No. **1:24-cv-2074-RCL** |
| **UNITED STATES DEPARTMENT OF AGRICULTURE**, **BROOKE ROLLINS**, *in her Official Capacity as Secretary, U.S. Department of Agriculture*, **ANIMAL AND PLANT HEALTH INSPECTION SERVICE**, and **MICHAEL WATSON**, *in his Official Capacity as APHIS Administrator*, | |
| *Defendants*. | |

## <u>MEMORANDUM OPINION</u>

This lawsuit challenges the licensing of Yellowstone Bear World ("Bear World"), a private Idaho zoo that displays animal species endemic to the Mountain West, including, as relevant in this case, black bears. In 2023, the federal government renewed Bear World's animal exhibitor license. Plaintiffs Animal Legal Defense Fund ("ALDF") and ALDF member Sally Baldwin have sued the U.S. Department of Agriculture ("USDA"), Agriculture Secretary Brooke Rollins,[1] the Animal and Plant Health Inspection Service ("APHIS"), and APHIS Administrator Michael Watson, seeking judicial review of the license renewal under the Administrative Procedure Act ("APA"). Defendants have moved to dismiss the case for lack of Article III standing, *see* Mot. to

---

[1] Brooke Rollins is ordered substituted as defendant in her official capacity as Secretary of the U.S. Department of Agriculture in place of former Secretary Thomas J. Vilsack. *See* Fed. R. Civ. P. 25(d).

Dismiss, ECF No. 25 ("Mot.").  Because Baldwin and ALDF both have satisfied the requirements for standing at this stage of the litigation, the motion will be **DENIED**.

## I.  BACKGROUND

### A.  The Animal Welfare Act

Under the Animal Welfare Act ("AWA"), the Secretary of Agriculture must "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors."  7 U.S.C. § 2143(a)(1).  Those standards include "minimum requirements for handling, housing, feeding, watering, sanitation, ventilation, shelter from extremes of weather and temperatures, [and] adequate veterinary care."  *Id.* § 2143(a)(2)(A).

The AWA restricts the exhibition of animals to persons who have obtained a license from APHIS, a USDA sub-agency.  *See id.* § 2134.  Licenses last for three years.  9 C.F.R. § 2.5(a).  Before licensing an exhibitor, APHIS must "make such investigations or inspections as he deems necessary to determine whether any . . . exhibitor . . . has violated or is violating any provision of this chapter or any regulation or standard issued thereunder." 7 U.S.C. § 2146(a).  APHIS thus conducts premises inspections in connection with licensing applications.  9 C.F.R. § 2.3(b) (providing that exhibitors must "be inspected by APHIS and demonstrate compliance with the Act and [its implementing] regulations and standards . . . before APHIS will issue a license").  APHIS may not issue licenses to applicants that have "made any false or fraudulent statements . . . to the Department or other government agencies," *id.* § 2.11(a)(7), or who "[i]s or would be operating in violation or circumvention of any . . . State . . . laws," *id.* § 2.11(a)(6).

The AWA and its implementing regulations also task prospective exhibitors with certain responsibilities during the licensing process.  Licenses cannot issue unless an exhibitor has "demonstrated that his facilities comply" with USDA standards.  7 U.S.C. § 2133.  To that end, prospective exhibitors must acknowledge—and certify that they will adhere to—those standards.

9 C.F.R. § 2.2.  Prospective exhibitors also must allow an "inspect[ion] by APHIS and demonstrate compliance with the Act and the regulations and standards . . . before APHIS will issue a license." *Id.* § 2.3(b).  Failure to comply with the AWA or related USDA standards and regulations "constitute[s] grounds for denial of a license." *Id.* § 2.1(d).

### B.  Bear World

Bear World is a drive-through wildlife park and petting zoo in southeastern Idaho. *See* Am. Compl. ¶ 73, ECF No. 22.  The park displays a variety of wildlife, including black and grizzly bears, and as of February 2023, it housed more than 100 animals, including at least seventy-six black bears. *Id.*  It is situated on a popular route to and from Yellowstone National Park and operates from May through October each year. *Id.*

Bear World generates income, in part, by allowing the public to interact with bear cubs. On its website, the park advertises "bottle feeding" experiences, during which members of the public over five years old can bottle feed and pet baby bear cubs. *Id.* ¶ 74.  The experience is offered three times per day and costs $75. *Id.*  It also offers "VIP Cub Encounters," which allow groups of up to sixteen people to interact with bear cubs in "private" settings. *Id.* ¶ 75.  Cub interactions occur on the premises at Bear World, as well as during traveling exhibitions called "Baby Animal Days" that occur throughout the region. *Id.* ¶ 76.

Plaintiffs allege that Bear World's cubs show signs of distress, including "crying, struggling to escape handlers and the public, hanging limp from apparent exhaustion," and "abnormal suckling and pacing." *Id.* ¶ 77.  Plaintiffs also allege that Bear World "withholds food from the bear cubs" to maximize public feeding experiences, a practice that "deprives cubs of necessary sustenance" and "causes unnecessary behavioral stress." *Id.* ¶ 78.  Bear World also separates cubs from their mothers around "eight weeks" after birth, even though cubs in the wild

3

remain with their mothers for "up to two years," according to Bear World's website. *Id.* ¶ 79 (quoting website).

Plaintiffs allege that Bear World has operated in violation of the AWA and other federal and state laws. They also allege that at least two agencies have cited Bear World for legal violations: Plaintiffs allege that Bear World received a fine from the Occupational Safety & Health Administration for placing employees at risk of injury by bears in January 2023, and that the Idaho Department of Fish & Game cited Bear World for violating state law on July 11, 2022. *Id.* ¶ 90. Nonetheless, in 2023, APHIS renewed Bear World's three-year exhibition license. *Id.* ¶ 7. Plaintiffs allege that the renewal resulted from an inadequate inspection of Bear World's premises and legal history.

### C. Plaintiff Baldwin's Experience at Bear World

Plaintiff ALDF is a California-based non-profit organization with thousands of members that engages in animal advocacy throughout the country. Am. Compl. ¶ 14. Sally Baldwin is a member of ALDF who lives in Idaho Falls. *Id.* ¶ 28.

From 1998 to 2018, Baldwin visited Bear World annually, and she had a particular interest in viewing black bears and cubs. *Id.* ¶¶ 29–30. In 2018, however, Baldwin discovered that "Bear World's bottle feeding and maternal deprivation practices exploit and harm the bears for profit." *Id.* ¶ 30. For several years, she refused to visit Bear World because of its animal treatment, until she returned to the park in August 2022 with her son, who wanted to "document the observable effects on the bears resulting from Bear World's harmful treatment" by videorecording the bottle feeding experience. *Id.* ¶ 31. During the 2022 visit, Baldwin again witnessed bear cubs "exhibiting abnormal pacing behaviors," "severely overweight," "crying incessantly," and "so hungry they would do anything to get the bottle in their mouth." *Id.*

Following the August 2022 visit, Baldwin "began spending time trying to improve the circumstances of the bears." *Id.* ¶ 32. In April 2023, she traveled to Bear World's traveling exhibit in Wellsville, Utah to participate in a protest at the entrance to the facility. *Id.* She also stopped visiting local businesses in the Idaho Falls area that had hosted the Bear World traveling exhibit. *Id.* ¶ 33. Baldwin asserts that she and other ALDF members have "aesthetic, emotional, and educational interests" in the protection of the bear cubs and "wish to observe the animals in humane conditions and, likewise, are injured by seeing them in inhumane, harmful conditions." *Id.* ¶¶ 34–35.

### D. Procedural History

This case began with the filing of a Complaint on July 16, 2024. *See* Compl., ECF No. 1. The parties fully briefed a motion to dismiss for lack of standing in late 2024. *See* ECF Nos. 12, 16, 19. After Defendants replied, however, Plaintiffs docketed a notice indicating their intent to amend the complaint "to address new arguments . . . that Defendants raised for the first time in their reply" pertaining to ALDF's IRS Form 990. Pl.'s Notice of Intent to File Am. Compl. at 1, ECF No. 20. Plaintiffs requested that the Court "defer ruling" on the then-pending motion, *id.*, and with Defendants' consent, Plaintiffs amended their allegations on February 20, 2025. *See generally* Am. Compl.

In the operative Amended Complaint, Plaintiffs contend that USDA and APHIS's renewal of Bear World's exhibition license "violate[d] the Animal Welfare Act, the USDA's own regulations, and the APA." *Id.* ¶ 76. As previously noted, Plaintiffs allege that APHIS's inspection of the premises at Bear World occurred outside the normal season and did not allow inspectors to examine its exhibition, handling, and transportation of bear cubs. *Id.* ¶ 77. They also assert that

APHIS overlooked reports of federal and state law violations related to the handling of animals, which Bear World allegedly failed to report on its application. *Id.* ¶¶ 78–81.

Defendants renewed their motion to dismiss for lack of standing on April 7, 2025, focusing again on whether Baldwin had plausibly alleged cognizable injuries and whether ALDF qualified as a membership organization for purposes of associational standing. *See* Mot. Plaintiffs opposed on April 21, 2025, Mem. in Opp., ECF No. 26 ("Opp."), and Defendants replied on May 1, 2025, Reply, ECF No. 29. The renewed Motion is now ripe for review.

## II.    LEGAL STANDARDS

### A.  Motion to Dismiss for Lack of Standing (Rule 12(b)(1))

"Article III of the Constitution limits the judicial power of the federal courts to '[c]ases' and '[c]ontroversies,'" which "creates a jurisdictional requirement that the plaintiff have standing to sue." *Nucor Steel-Ark. v. Pruitt*, 246 F. Supp. 3d 288, 300 (D.D.C. 2017) (Brown Jackson, J.) (quoting U.S. Const., art. III, § 2). Because the standing requirement implicates federal subject-matter jurisdiction, a "challenge to the standing of a party, when raised as a motion to dismiss, proceeds pursuant to Rule 12(b)(1)." *Johnson v. District of Columbia*, 71 F. Supp. 3d 155, 158 (D.D.C. 2014). Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Grand Lodge of the Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). For this reason, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim. *Id.* at 13–14 (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 (2d ed. 1987)) (internal quotation marks omitted).

The burden of proving standing rests with the plaintiff, who must show "(i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 368 (2024).  The plaintiff must show "each element . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  So, on a Rule 12(b)(1) motion, the watchword for surviving a standing challenge is plausibility.  Like when reviewing a motion under Rule 12(b)(6), the Court must "assume the truth of all material factual allegations in the complaint" and "grant[] the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).  The Court also "may look to documents outside of the complaint in order to evaluate whether or not it has jurisdiction to entertain a claim." *Doe v. Wash. Metro. Area Transit Auth.*, 453 F. Supp. 3d 354, 361 (D.D.C. 2020) (Brown Jackson, J.).  To avoid dismissal, the complaint must "'state a *plausible* claim' that the elements of standing are satisfied." *Nucor Steel*, 246 F. Supp. 3d at 301 (quoting *Humane Soc'y of U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015)).

## III.    ANALYSIS

The parties spar over Plaintiffs' showings both on the adequacy of Baldwin's individual standing and on ALDF's associational standing, which raises the question of where to begin. Because a successful assertion of associational standing requires showing that at least one of the association's "members would otherwise have standing to sue in their own right," *Viasat, Inc. v. Fed. Commc'ns Comm'n*, 47 F.4th 769, 781 (D.C. Cir. 2022), and because Baldwin is the only member that ALDF puts forward to satisfy that requirement, the Court will address Baldwin's individual standing before turning to ALDF's associational standing.

### A. Individual Standing

As noted above, an individual plaintiff must make three showings to assert Article III standing: "(i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *All. for Hippocratic Med.*, 602 U.S. at 368. The thrust of the parties' dispute over Baldwin's individual standing centers on the injury-in-fact and causation requirements,[2] and the Court will address them in that order.

### i. Injury in Fact

As to injury, Defendants contend that Baldwin alleges only an emotional injury and maintain that "purely emotional injuries" like Baldwin's, standing alone, cannot sustain Article III standing. Mot. at 4 (citing *Humane Soc'y v. Hodel*, 840 F.2d 45, 52 (D.C. Cir. 1988)); *see also All. for Hippocratic Med.*, 602 U.S. at 390 n.3 ("[D]istress at or disagreement with the activities of others is not a basis under Article III for a plaintiff to bring a federal lawsuit challenging the legality of a government regulation allowing those activities."). Baldwin responds that her allegations amount not to a bare emotional injury, but to a well-recognized "aesthetic injury," which she suffers because Defendants' re-licensing prolongs the suffering of the bears. Opp. at 1, 6.

---

[2] Courts, of course, have "an independent obligation" to assure ourselves of subject-matter jurisdiction over a dispute, including Article III standing, "regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). That being so, the lack of dispute over redressability cannot, on its own, support standing. *Vir. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662–63 (2019) ("As a jurisdictional requirement, standing to litigate cannot be waived or forfeited."). The element, however, is easily met here. The standard for redressability in the context of an ongoing injury caused by administrative action is not a demanding one. "[W]hen a plaintiff alleges—as Plaintiffs have alleged here—that the challenged action is causing ongoing injury, a court order vacating that action (or remanding the case to the agency for further consideration of that action) will generally redress the alleged injury." *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 749 F. Supp. 3d 26, 54 (D.D.C. 2024). So too here with respect to the injuries that Bear World's alleged treatment of animals causes Baldwin. A decision vacating the renewal of Bear World's 2023 license "would alter that state of affairs in a manner likely to remedy, at least in part, [Baldwin's] injuries." *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 620 (D.C. Cir. 2017).

Baldwin has it right. Her asserted aesthetic injury is not some conservationist idealism. To the contrary, seminal case law on modern standing theory explains that "the desire to use *or observe* an animal species, *even for purely esthetic purposes*, is undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 562-63 (emphasis added). Thus, "people have a cognizable interest in view[ing] animals free from . . . inhumane treatment." *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 433 (D.C. Cir. 1998) (internal quotation marks omitted) (quoting *Humane Soc'y v. Babbitt*, 46 F.3d 93, 99 n.7 (D.C. Cir. 1995)). From that premise flows the logical conclusion that a plaintiff may "suffer aesthetic injury . . . from government action that leaves some animals in a persistent state of suffering." *Id.* The "key" to unlocking standing based on an aesthetic injury "is that the plaintiff [must] have suffered his injury in a personal and individual way—for instance, by seeing with his own eyes the particular animals whose condition caused him aesthetic injury." *Id.* at 433. "[F]ailure to show such direct use," or some other personal and individualized attachment, will "result[] in the denial of standing." *Id.* at 435.

Baldwin's claims fall well within the D.C. Circuit's parameters for aesthetic injury-in-fact. She alleges that she regularly visited Bear World during its period of licensure,[3] and she witnessed the particular confinement and treatment of the bear cubs that caused her injury. Am. Compl. ¶ 30–31. Indeed, these facts bear congruity to the facts supporting injury-in-fact in *Glickman*. There, the Court found that at least one plaintiff "clearly satisfie[d]" the requirement to plead a personalized aesthetic injury, where that plaintiff had visited the offending zoo "at least nine times" and observed primates and other animals to which he had an aesthetic

---

[3] Defendants bristle at the fact that, as alleged, Baldwin's visits to Bear World all predated the 2023 license renewal. *See* Mot. at 6. But the only reasonable inference from the fact that APHIS *renewed* Bear World's license in 2023 was that Bear World had been licensed by USDA previously, and the Court assumes favorably to Baldwin that at least some, if not all, of her visits coincide with that period.

attachment "living under inhumane conditions." *Glickman*, 154 F.3d at 429, 435. He stated that he wished "to observe, study, and enjoy these animals in humane conditions." *Id.* at 432.

To the extent Defendants frame Baldwin's injury as purely emotional, they place too much emphasis on the nature of the injury, at the expense of the type of *interest* injured. Baldwin plausibly alleges that she suffers "ongoing emotional distress from having observed the mistreated bears at Bear World and her inability to observe bears being treated humanely," and that such distress "constitutes a cognizable injury to an aesthetic interest." Opp. at 6. "[H]arm" that "affects the . . . mere esthetic interests of the plaintiff" "support[s] standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). Thus, since the "observation of wildlife" is a "classic aesthetic interest[]," it has long "enjoyed protection under standing analysis." *Humane Soc'y*, 840 F.2d at 51–52.

Nor are these injuries, as Defendants say, "psychological consequences 'produced by observation of conduct with which one disagrees.'" *Penkoski v. Bowser*, 486 F. Supp. 3d 219, 233 (D.D.C. 2020) (noting that such injuries are not cognizable). To the contrary, like in *Glickman*, Baldwin has alleged "far more than an abstract, and uncognizable, interest in seeing the law enforced." 154 F.3d at 432. Rather, Baldwin's allegations, which the Court must take as true in this posture, "ma[k]e clear that [s]he has an aesthetic interest in seeing exotic animals living in a nurturing habitat," "that [s]he has attempted to exercise this interest by repeatedly visiting a particular animal exhibition to observe particular animals there," and that "[t]his interest was allegedly injured" when she " witnessed the actual living conditions of the" bear cubs. *Id.* She need not do more at this stage.

## ii. Causation

Defendants also contend that Baldwin lacks standing for failure to plead causation. To assert standing, a plaintiff must show that her injury is "fairly traceable" to the defendant's actions. *Bennett v. Spear*, 520 U.S. 154, 162 (1997). In the context of federal agency action, a "plaintiff satisfies the causation prong of constitutional standing by establishing that the challenged agency [approval] permitted the activity that allegedly injured her, when that activity would allegedly have been illegal otherwise." *Glickman*, 154 F.3d at 440–41. Similar principles apply even when a private third party inflicts the harm, when the harm was facilitated by the challenged agency approval. "[I]njurious private conduct is fairly traceable to the administrative action contested in the suit if that action authorized the conduct or established its legality." *Tel. & Data Sys., Inc. v. F.C.C.*, 19 F.3d 42, 47 (D.C. Cir. 1994).

Defendants contend that Baldwin lacks standing to seek injunctive relief because she has an "unchecked ability" to avoid future injuries by "decid[ing] not to observe or participate in the bottle-feeding and public handling of bear cubs." Mot. at 6. They analogize to the Supreme Court's decision in *Alliance for Hippocratic Medicine*. There, a group of emergency room physicians with conscience objections to performing abortion procedures sued the Food and Drug Administration ("FDA") to the authorization of mifepristone, a drug that can be prescribed to terminate an early pregnancy. 602 U.S. at 385–86. The doctors "d[id] not prescribe, manufacture, sell, or advertise" mifepristone themselves. *Id.* at 385. But they offered a theory of standing premised on the assumption that a pregnant woman who took mifepristone faced an elevated risk of requiring an *emergency* surgical abortion, and that, in turn, "some women would likely seek treatment from these plaintiff doctors," "against [the doctors'] consciences." *Id.* at 386–87. But the Supreme Court found that federal legal protections "against being required to provide abortions

or other medical treatment against their consciences," including those related to "mifepristone complications," broke the "chain of causation" between FDA's authorization of mifepristone and the physician's asserted injuries. *Id.* at 388, 390.

Even a cursory review of the relevant case law reveals the faults in Defendants' attempt to equate the causal deficiency in *Alliance for Hippocratic Medicine* with the facts presented here. Again, *Glickman* is instructive. To start, "[i]t is well settled that a plaintiff has standing to challenge conduct that indirectly results in injury." *Glickman*, 154 F.3d at 441 (quoting *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705 (D.C. Cir. 1988)). Thus, "[m]ere indirectness of causation is no barrier to standing, and thus, an injury worked on one party by another through a third party intermediary may suffice" to show fair traceability between plaintiff and defendant. *Id.* The inquiry is concerned "not with the length of the chain of causation" but focuses instead "on the plausibility of each of the links that comprise the chain." *Id.*

The plausibility of Baldwin's alleged chain of causation distinguishes her from the doctors in *Alliance for Hippocratic Medicine*. "[F]ederal law protects doctors from repercussions when they have 'refused' to participate in an abortion," so if one of the plaintiffs performed the procedure anyway, he would be unable to show that any resulting conscience injury could have been plausibly traced to FDA's authorization of mifepristone. *Id.* at 389 (quoting 42 U.S.C. § 300a–7(c)(1)). Instead, any injury could be traced only to the doctor's own decision to decline the protections of federal law. Thus, the fact that FDA authorized the availability of mifepristone was causally disconnected from whether those doctors might provide abortions against their consciences. *Alliance for Hippocratic Medicine* assumed that the doctors' beliefs would lead them to invoke federal conscience protections and thereby avoid injury.

Baldwin's case presents a materially different configuration of interests and actions. The doctors' opposition to abortion (coupled with statutory immunity) would motivate (and permit) them to *avoid* any conscience injury they would suffer by having to perform the procedure. By contrast, Baldwin's values *impel* her to be concerned for the bear cubs and thereby suffer injury when she either (i) views the bear cubs suffering or (ii) avoids viewing the bear cubs altogether. Perhaps Defendants are technically correct that Baldwin, in some abstract Cartesian sense, could elect not to view the bear cubs living in the offensive conditions she complains of. But such free-will libertarianism grossly misses the point. For one thing, it is entirely divorced from Baldwin's "aesthetic interest in observing animals living under humane conditions." *Glickman*, 154 F.3d at 439 n.9. And it also ignores the *ongoing* quality of her alleged injuries. She alleges that she is "haunted by the need to help the bears," Am. Compl. ¶ 31, and that she continues to be deprived of the aesthetic enjoyment of viewing animals in humane conditions, *see id.* ¶ 35 (alleging that if the feeding practices end, she "will visit [Bear World] and enjoy observing the animals living under much more humane conditions"); *id.* at ¶ 32 (alleging that she attended a protest at a traveling Bear World exhibition in April 2023, two months after the license renewal, but did not enter the exhibition or, presumably, view any bears). To the extent Baldwin *no longer* visits Bear World because of her aversion to seeing the cubs in distress, her deprivation of the opportunity to view the bear cubs constitutes an ongoing injury to those interests. *See Am. Soc'y For Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 338 (D.C. Cir. 2003) ("[A]n injury in fact can be found when a defendant adversely affects a plaintiff's enjoyment of flora or fauna, which the plaintiff wishes to enjoy again upon the cessation of the defendant's actions."). The Court finds it plausible that these injuries are fairly traceable to USDA's licensing of Bear World, without which the zoo's ongoing exhibition of bear cubs would be unlawful.

13

Defendants present one other challenge to Baldwin's standing, suggesting that her most recent visit to the park "predated the challenged re-licensing decision." Mot. at 6. Although Defendants hardly develop this argument,[4] it appears to be an invitation for the Court to draw the chronological inference that injuries stemming from those visits cannot plausibly be traced to a license renewal that had yet to occur. Yet, as already explained, Baldwin's traceable injuries are ongoing. Baldwin's allegations accordingly fall within the traceability requirements for constitutional standing. She alleges that APHIS has issued a license premised on compliance with the AWA to a private zoo that violates the AWA and USDA regulations. After observing those violations, Baldwin now suffers a cognizable aesthetic injury, which would be abated by a licensing decision that complied with federal law.

### B. Associational Standing

Having established that Baldwin may assert standing in her individual capacity, the Court now turns to the associational standing of ALDF (of which Baldwin is a member). To establish associational standing, an organization must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

"This path to standing is always available to a 'voluntary membership organization with identifiable members' that 'represents [its members] in good faith.'" *Travelers United, Inc. v. Hyatt Hotels Corp.*, 761 F. Supp. 3d 97, 117 (D.D.C. 2025) (quoting *Students for Fair Admissions*

---

[4] Plaintiffs invite the Court to find the argument forfeited, *see* Opp. at 10-11, but the Court has an "obligation to independently assure itself of its subject-matter jurisdiction," *Green Oceans*, 2024 WL 973540, at *3, and thus will address the arguments on their merits.

*v. Pres. & Fellows of Harv. Coll.*, 600 U.S. 181, 201 (2023) ("*SFFA*")).  Organizations that lack members in the traditional sense "may also have associational standing," *id.*, but to do so, the organization must show that it bears the "indicia of a traditional membership association." *Viasat*, 47 F.4th at 781.  "This turns on considerations such as whether members finance the organization, guide its activities, or select its leadership." *Id.*  The ultimate inquiry is whether the entity is "a genuine membership organization in substance, if not in form." *SFFA*, 600 U.S. at 200.

Defendants contend that ALDF lacks associational standing for two reasons.  First, Defendants assert that ALDF lacks the "indicia of membership" required under *Hunt*.  Mot. at 6. This argument, however, assumes that ALDF is not *in fact* a traditional membership organization, which is mistaken.

When "an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates." *Int'l Dark-Sky Ass'n, Inc. v. FCC*, 106 F.4th 1206, 1217 (D.C. Cir. 2024) (quoting *SFFA*, 600 U.S. at 200).  Only if an organization "has *no* members in the traditional sense" does the standing inquiry turn on "whether the organization is the functional equivalent of a traditional membership organization." *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002) (emphasis added).  Thus, a court examining associational standing need only hunt for other "indicia of membership" when an organization's "affidavit . . . makes no reference to membership," *Viasat*, 47 F.4th at 781–82, where the "complaint [did] not describe [the] plaintiff as a membership organization," *Travelers United, Inc. v. Hilton Worldwide Holdings Inc.*, 2024 U.S. Dist. LEXIS 101509, at *26–27 (D.D.C. June 7, 2024) (Howell, J.), or where there simply is no indication that an organization "actually has any members," *Fund Democracy*, 278 F.3d at 25; *see Wash. Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 208 (D.D.C. 2007) (same).

ALDF's allegations suffer from none of those defects. ALDF alleges that its "members" are individuals "who have made a financial contribution to [ALDF] in the last five years." Am. Compl. ¶¶ 16, 18. ALDF "has records that identify its current and former members," *id.* ¶ 16, and more than 300,000 such persons are alleged to exist, *see id.* ¶ 14. These members are essential to ALDF's operations, as "financial contributions from individual members constituted more than half of ALDF's total revenue" in "each of the past five years." *Id.* ¶ 18. About ten percent of member funding was "restricted to specific areas of work that align with subject matters most important" to those members, suggesting that "members use their funding to specifically direct ALDF" and its operations. *Id.* ¶ 20. Members also "submit tips to bring instances of animal cruelty and harmful welfare conditions to ALDF's attention" and provide feedback that is "used to guide and shape aspects of ALDF's work." *Id.* ¶ 25. "ALDF's programmatic work, including litigation like this, is intended to advance its mission and represent its members' interests in achieving that mission." *Id.* ¶ 24. These allegations, taken as true, adequately bear ALDF's burden to show it "has identified members and represents them in good faith." *SFFA*, 600 U.S. at 200 (ratifying the First Circuit's finding that "at the time SFFA filed suit, it was a 'validly incorporated 501(c)(3) nonprofit with forty-seven members who joined voluntarily to support its mission'" as establishing SFFA was a traditional membership organization (quoting 980 F.3d 157, 184 (1st Cir. 2020)); *see also Students for Fair Admissions v. President & Fellows of Harv. Coll.*, 261 F. Supp. 3d 99, 109 (D. Mass. 2017) (same), *aff'd* 980 F.3d 157 (1st Cir. 2020), *rev'd on other grounds*, 600 U.S. 181 (2023).

Defendants assert that these allegations are at odds with the representations ALDF made to the Internal Revenue Service in its 2024 Form 990, observing that "in response to the question whether the Fund has 'members or stockholders,' the Fund responded 'No.'" Mot. at 7 (quoting

Form 990, Animal Leg. Def. Fund, http://aldf.org/wp-content/uploads/2025/03/FY-2024-Animal-Legal-Defense-Fund-Tax-Form-990-Public-Disclosure.pdf (last visited July 29, 2025)).  Yet as ALDF convincingly observes in rebuttal, "Defendants' suggestion that this response" on the Form 900 "means that ALDF does not have 'members' conflates the narrow, specialized sense of that term used by the IRS with that applicable for purposes of associational standing." Opp. at 15.  "As the Form 990 instructions explain, '[f]or purposes of Form 990, Part VI, member means . . . any person who . . . has the right to participate in the organization's governance or to receive distributions of income or assets from the organization.'" *Id.* at 16 & n.7 (citing Instructions for Form 990 Return of Organization Exempt from Income Tax, https://www.irs.gov/instructions/i990).  "The IRS itself acknowledges that an organization may also have other members who do not meet the Form 990 definition because they are not 'vested with certain governance or financial rights with regard to the organization.'" *Id.* at 16 & n.8. Defendants cite no authority for the notion that a Form 990 response is dispositive of whether an associational plaintiff is a "traditional membership organization" within the meaning of standing jurisprudence.  The Court cannot fathom (and the Defendants certainly have not explained) why such a rule would be sensible.  Because the Court is persuaded that ALDF *is* a membership organization, "[t]he indicia of membership analysis . . . has no applicability" in this case. *SFFA*, 600 U.S. at 201.

Defendants also raise a second challenge to ALDF's associational standing on the ground that none of ALDF's "members would otherwise have standing to sue in their own right." *Hunt*, 432 U.S. at 343.  Defendants substantiate this point primarily by reference to their analysis of Baldwin's individual standing. Mot. at 10.  As discussed *supra*, Baldwin has individual standing, so that argument, broadly speaking, lacks merit.  As to ALDF's associational standing, however,

the Defendants pull at one more thread, raised for the first time in their reply brief,[5] suggesting that Baldwin is not a member of ALDF at all. *Compare* Reply at 4 *with* Mot. at 10. They briefly note that "the Complaint does not even allege when, if at all, Ms. Baldwin last made a financial contribution to the Fund, alleging only in a conclusory fashion that she is a 'member' of the Fund." Reply at 4. Defendants then parenthetically contrast these allegations with *SFFA*, where the Supreme Court found that the plaintiff association members had, in Defendants words, "voluntarily joined and contributed to the organization's efforts, supported the organization's mission, and had been afforded the opportunity to direct the litigation." Reply at 4–5 (citing *SFFA*, 600 U.S. at 201). Defendants' implication would seem to be that Plaintiffs have not plausibly alleged that Baldwin is a member of ALDF (or that she *was* a member during the relevant period[6]), and so Plaintiffs cannot have plausibly alleged that "at least one member[] would otherwise have standing to sue in their own right." *Viasat*, 47 F.4th at 781.

It is true that the Amended Complaint does not specifically set forth such detailed allegations, but that hardly makes them conclusory. Plaintiffs' allegations, including concerning Baldwin's membership, are subject to ordinary pleading standards. Judging the plausibility of such allegations "is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). And it is axiomatic that available reasonable inferences should favor the non-movant. In light of these principles, and at this stage, it is reasonable to conclude from Baldwin's allegation of membership in ALDF in the broader context of this litigation that she was a member of ALDF at the time she visited Bear

---

[5] "Ordinarily, arguments raised for the first time in a reply brief are considered waived" or forfeited, *Dallas Safari Club v. Bernhardt*, 518 F. Supp. 3d 535, 538 n.3 (D.D.C. 2021), the Court addresses the issue to assure itself of subject-matter jurisdiction. *See supra* note 2.

[6] A plaintiff may establish standing based only on the facts as they existed at the time of a suit's filing. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed.").

World.  Should discovery indicate otherwise, Defendants may raise the issue in a successive motion. *See Lujan*, 504 U.S. at 561 (noting that plaintiffs must show "each element" of standing "with the manner and degree of evidence required at the successive stages of the litigation").

## IV.    CONCLUSION

Based on the foregoing, the Court will **DENY** the motion by separate order.

Date: ___8-7-25___

Royce C. Lamberth
United States District Judge